**PROBST v. SMITH HARDWARE CO.,**
Limited (two cases).

**MAITRE v. SMITH HARDWARE CO.,**
Limited (two cases).

No. 970.

Court of Appeal of Louisiana. First Circuit.

May 3, 1932.

Milner & Porteous, of New Orleans, and Thos. M. & Jas. T. Burns, of Covington, for appellant.

H. E. & F. B. Ellis, of Covington, and H. W. Robinson, of New Orleans, for appellee.

MOUTON, J.:

February 26, 1931, Mr. Franz Probst was driving a Ford sedan northward from Covington to Bogalusa which was struck in the rear by a Chevrolet truck. Frank Silver was driving for defendant company.

Mr. Edward Maitre was on the front seat with Mr. Probst, and his wife, with Mrs. Maitre, were sitting on the rear seat of the sedan when the collision occurred.

The sedan was badly damaged, and the four occupants of the car suffered personal injuries as a result of the accident, for which they recovered judgments below in separate amounts, from which defendant company prosecutes this appeal.

The collision occurred about 2 miles south of Bogalusa on a graveled highway, 22 feet in width.

Mr. Probst, the driver of the sedan, which was traveling ahead of the truck, did not know the road to Bogalusa, his point of destination. He testifies that he saw a pedestrian coming on his left towards him from Bogalusa, and that, as he desired to get information about the route, he proceeded at about 150 feet before getting to him, to gradually slow down the sedan, and that just as he had reached at about 10 feet from this pedestrian, who, the evidence discloses, was Mr. Otis Corkern, he hailed him, and at that moment, as he was coming to a stop, his car was struck in the rear by the truck. Mr. Probst is positive that at that time, and before, the sedan was on his right-hand side of the highway.

As the highway, at that point, is 22 feet wide, there was 11 feet on each side from the center line of the highway. Mr. Probst testifies that there was 14 feet on his left from the side of his sedan for the passage of the truck, which shows, according to his evidence, that his car was 3 feet from the center line.

The other three occupants of the sedan testify substantially to the same effect, and all four say that the truck had ample room to pass on the left side of the sedan going northward to Bogalusa.

Mr. Corkern, the pedestrian, at first testified, that the sedan was entirely on the right-hand side of Mr. Probst, but afterwards, on close questioning, said he had pulled his car to his left and slightly over the center line of the roadway.

It is hard to believe, if believable at all, that Silver, who was driving the truck, with plenty of room, according to these witnesses

to pass on the left of the sedan, would have run against it in the rear, thus causing the damages complained of. The proof shows that Silver had been operating this truck as an employee of defendant company for about three years prior to this accident, and must therefore have been an experienced driver. True, he is a colored man, but the instinct of self-preservation, always present in all of us, it seems, would have prompted him from committing such a reckless act.

The sedan being closed in the rear, neither Mr. Probst nor the other occupants of the car saw the truck, which was coming behind them, and, hence, knew nothing about the speed at which it was advancing.

Corkern, from whom information as to the route was being asked, says he saw the truck at a distance of about 100 yards or 300 feet as it was coming towards him, and that it was then moving at the speed of 50 to 55 miles an hour; that it never slackened its speed, and, more than that, says Silver deliberately ran into the sedan.

Such testimony as that is almost incredible, and could be taken as true only if it were supported by the testimony of other witnesses, or by corroborating facts or circumstances upon which a belief in such a statement could rest. It may be stated now before continuing the discussion on this feature of the case that, as the truck was coming toward Corkern, it was impossible for him to make an approximately accurate estimate as to the rate of speed the truck was then moving, as this court has heretofore taken occasion to say on the same subject-matter in cases submitted to it for decision.

Corkern, whose testimony was taken before a notary and who the trial judge did not have the opportunity of seeing on the witness stand, said also that, when the impact occurred, the truck had not slackened its speed, was then moving at 50 or 55 miles an hour.

He was in no better position at that time to make such an estimate then he was when he first saw the truck. Hence, the estimate of the speed of the truck given by Corkern can afford no criterion for a proper determination of its speed at that time.

As Probst and his companions in the sedan could give no information on that subject, we are forced to resort to the facts relative to the condition and positions of the vehicles after the collision.

The result of the accident showed considerable damage to the sedan and less to the truck. The truck passed ahead of the sedan, about the length of the truck and trailer, and was turned across the road. The sedan was thrown to the right-hand side of the road going towards Bogalusa, was turned over in the ditch with two of its wheels in the air. The proof shows that the trailer was 14 feet

long, and the truck not quite as long, which indicates that their combined length could not have been over 25 feet. It was therefore at about that distance from the point of contact that the truck was found across the roadway after the accident.

The evidence shows that the truck struck the left rear end of the sedan. It is shown that the truck's weight was one ton and one-half. It seems to us that a 3,000-pound truck in motion, if going at 50 or 55 miles an hour, would have gone much further than 25 feet from the point of contact. It occurs to us, also, that, if the sedan had stopped or was stopping when hit, as appears from the evidence, it would have been torn to pieces, and its occupants would not all have escaped with their lives.

Silver, driver of the truck, says that he had slowed down the truck from about 30 miles an hour to 25 when he struck the sedan. His testimony, in reference to the speed of the truck, is more in keeping with the facts, judging from the results of the collision, and more acceptable in guiding the court to a correct solution of the issues in this case.

The testimony of Spencer Allen, witness for plaintiff, is that a Mr. Menish, in company with Corkern, obtained a statement from him in reference to the collision. It seems a little peculiar that Corkern should have manifested such an interest in this case. It might be said that his going with Menish to obtain the statement was a mere coincidence, and should have no influence in our consideration of his testimony. Ordinarily it should be so viewed, but, when taken in connection with Corkern's other exaggerated statements about the truck speeding at the rate of 50 or 55 miles an hour, and to the deliberate act of Silver running into the sedan, hereinabove referred to, we are constrained to note Corkern's conduct in obtaining a statement from Allen as a proper link in the chain of the evidence for the purpose of getting at a correct appreciation of his testimony.

Probst testifies that when he hollered at Corkern his hand was extending out of the left front window of the sedan. The back windows, he says, were closed, and the right front window was down about one inch for circulation of the air, although according to his testimony, the left front window was open from the time they left New Orleans to the moment of the accident, and this in the latter part of February. Mr. Probst testifies that, at a distance of over 100 feet from the point where the collision occurred, he had his hand out and began then or before to slow down as he approached Corkern from whom he intended to get direction about the route. The ladies, and Mr. Maitre, are equally certain that Mr. Probst's hand was out of the window, as he neared Corkern, some going to the extent of saying that it was in that position until the crash occurred. It may be

noted here that it is somewhat singular that those in the car, not driving, should have kept their eyes on the movements of Mr. Probst's arm up to the time of the impact.

These ladies, Mr. Maitre, and Mr. Probst all say the left front window was down, and constantly open from the time they left New Orleans to the moment of the occurrence. Why they should have been so observant of that fact is hard to understand, but nevertheless such is their testimony.

Corkern says that this window was open at the time of the wreck. Why he should have, in such a moment of excitement, noticed in what position the window was, is also somewhat peculiar.

After the accident the sedan was taken to the garage of Mr. Menish, at Bogalusa, for repairs. He testified, in reference to this window, that the glass was up about three or four inches above the body.

Mr. Smith, manager of defendant, heard of the wreck an hour or two after the accident, went to the Menish garage to investigate, and testifies that the left front window of the sedan was then about four inches from the top.

The evidence, above referred to, leaves the issue somewhat in doubt as to whether that window was down or partly open when the accident happened.

The witnesses best qualified to show whether the window was up or down obviously were Mr. Probst, who was driving the sedan, and Mr. Maitre, sitting next to him.

In the course of the trial plaintiff made a strenuous effort to show that Silver and Daniels, his companion in the truck, had also with them a colored girl, before and when the collision occurred. What was the purpose of that testimony is not revealed. It is claimed by plaintiff that this girl was at the scene of the accident when it occurred, which was denied by Silver and Daniels who admitted that they had picked up a colored girl on their way, but that she had gotten down at Bush a short while before the collision happened. It appears, however, that Carrebell Parker, a colored girl, was seen at the point of the accident, immediately after its occurrence.

Silver and Daniels denied that she was the colored girl they swore had stepped down at Bush. This girl, Parker, said she had come to the scene, not with Silver and Daniels, but with Davenport, a colored man, who had died since the accident.

This colored girl, Carrebell Parker, testified that, after she got at the place of the accident, she tied the hand of a man with a handkerchief. Asked on cross-examination to point the man out, she pointed to Mr. Probst. Called in rebuttal, Mr. Probst testified as follows on the subject.

"Q. Mr. Probst, did this negro girl, Carre Bell, tie up your hand after the accident? A. No.

"Q. Did anybody tie it up with a handkerchief? A. Tied it with newspaper and I held it in this position until we got to the hospital."

Mr. Probst was taken to the hospital in Bogalusa soon after the accident. First medical attention was given him by Dr. Fleming, a witness for plaintiffs.

Let us see what the doctor has to say about that handkerchief. When questioned in reference to the examination of the wound and referring to Mr. Probst, he answers as follows: "He was brought in the hospital by unknown parties with his left forearm tied up with a handkerchief, bleeding," etc. The colored girl, Carrebell, told the truth.

If the testimony about the handkerchief had surged out in the case as a mere incident, it might be said that Mr. Probst had given little attention to it, and that the matter had passed out of his memory. Such is not however the situation, as he was called in rebuttal to contradict the colored girl on that issue of fact, and, not only said no handkerchief had been used, but that his hand had been, to quote him: "Tied up with newspaper and I held it in this position until we got in the hospital."

Mr. Edward Maitre, who was sitting on the right of Mr. Probst when the accident happened, was also questioned in rebuttal to contradict Carrebell on the subject of the handkerchief, which seemed to have assumed considerable importance in the effort made to discredit this colored girl. The testimony of Mr. Maitre on this issue is that he accompanied Mr. Probst to the hospital, and was with him in the "operating room" and could not therefore have escaped every opportunity to see the handkerchief. He is asked: "Did you see a handkerchief on his hand anytime?" Answer: "No sir." He does not, however, seem to have seen the newspaper with which Mr. Probst says his hand was tied when he reached the hospital.

How is it possible for this court to give credence to the testimony of these two witnesses who, by the position they occupied when the accident happened, were the best qualified to direct us to a just solution of the issues here presented? For proper guidance in the determination of this contest, we are compelled to resort to the evidence of other witnesses and to the physical facts and circumstances of the case.

Mr. Walter Fisher, deputy sheriff of Washington parish, who lived a mile or so from the place of the accident, appeared a little while after the occurrence. In so far as the record discloses, he appears to be entirely disinterested as to the outcome of this trial.

He says the driver of the truck applied the brakes which was indicated by the wheels that had skidded on the left edge of the road. He saw the tracks which were large and said they were truck tracks. These truck tracks ran along the sloping side of the ditch for a distance of 30 feet, so he testifies. These tracks, we are satisfied, were made by the truck, although Mr. Probst endeavors to show they were left by a Cadillac car, he says, soon after the accident, that passed in that direction. Singular again must it be said that a man in such a moment should give observation to the passage of a Cadillac car, and to the possibility that its tracks might become an important factor in the decision of his claim.

Silver testifies he was going at about 25 miles an hour when the sedan "shot suddenly ahead of him," as he expressed it, got in the middle of the road; that he tried to stop the truck, but could not, and that the left wheels of the truck went into the ditch; and says, if he had not hit the sedan, he would have killed Corkern.

The testimony of Mr. Fisher shows by the marks of the tracks of the truck that Silver had made a desperate effort to miss the sedan by hugging the slope of the ditch to his left to a distance of 30 feet. Silver is therefore corroborated in his testimony by the physical facts of the case, as testified to by Mr. Fisher, and is also corroborated by the evidence of the young negro, Daniels, who was with him in the truck, and who also said that Silver had blown his horn twice.

From a careful analysis of the material facts of this case above given, the logical conclusion is that Mr. Probst suddenly, and without warning by a proper signal, veered to his left, got directly in the pathway of the truck, thus causing a collision which the driver of the truck could not have avoided by the utmost skill and care. The collision, having occurred under such circumstances, could simply not have been averted.

Counsel for plaintiff stoutly maintains, however, that Mr. Probst gave warning by extending his hand from the left front window, that it was therefore the imperative duty of the driver of the truck to have immediately stopped.

Counsel refers to the case of Joseph Henican v. P. L. Woodman, 1 La. App. 281, where the court held that the driver of the car in the rear should so regulate his speed as not to collide with the auto in front of him in case the latter comes to a stop.

No doubt, if the sedan had stopped in front of the truck on the right side of the highway, and the plaintiff had put his hand out of the left front window, and the truck had run into the sedan, defendant would be liable. The other case cited is that of Stevens v. Dean, 6 La. App. 537, where the party gave the proper signal by holding out his hand before turning to his left.

In that case the driver was turning to his left to drive straight into a driveway of a filling station which was situated on the right side of the roadway. In making this turn the court held the driver was using the highway in a lawful manner.

In this case there was no driveway, street, filling station, or road to the left of the sedan, and the driver of the truck could not expect, even if Mr. Probst extended his hand, that he was going to turn to his left.

The other case is that of Youman et al. v. McConnell & McConnell, 7 La. App. 315, where the driver was too close to the auto in front which came to a stop forcing the truck behind to run on a sidewalk where a pedestrian was injured.

This is not the situation here, as the truck, if the sedan had stopped in front of it, could have safely passed to its left without the possibility of a collision with any pedestrian on an adjoining sidewalk. In making the turn to the left, the truck was not jammed by any abutting sidewalk.

This signaling of the intention of turning to the left applies, as we understand the rule, to cases where the driver of the car in front is turning into a filling station, driveway, street, or road, or to enter his home or other premises on his left-hand side of the roadway. which was not the situation here. It is generally where the conditions above pointed out exist that the rule above mentioned has been applied. Blashfield, vol. 1, p. 443, § 15.

Even in such a case, says Mr. Blashfield, when the driver of the rear vehicle has sounded his horn to indicate his desire to pass, the driver in front should use ordinary care to avoid a collision.

In this case Daniels swore that the truck horn was sounded twice, but it is evident that Probst did not exercise any care whatever in making a sudden turn to his left.

That author says further in section 15, page 443: "If the driver in front, although signalling his intention to turn to the left, turns so suddenly as to collide with the rear vehicle so attempting to pass, the former must be deemed negligent."

■ Here, the testimony of Silver and Daniels shows that the sedan made an abrupt, unexpected, and sudden turn to its left directly in the pathway of the truck, and, even if Probst gave the proper signal, as it is stated by him and the others who were in his car, the turn was so rash and sudden that defendant cannot be held to have been negligent.

Our learned brother of the district court said: Section 15 of Act No. 296 of 1928 provides that such overtaking vehicle shall not drive to the left of the center of the highway to pass another vehicle unless such left side

512

is clearly visible and free from on-coming traffic for a sufficient distance to enable the driver to pass the car without danger from on-coming traffic.

The accident in the instant case took place on a public highway which runs through the open countryside of St. Tammany parish and where the left center of that highway was "clearly visible and free of oncoming traffic" at the time, and for a "sufficient distance," to have enabled the truck to pass the sedan "without danger from oncoming traffic."

The only obstacle on the left side of that roadway, if it be possible to refer to him as such, was the solitary Mr. Corkern, the pedestrian, who was coming on the edge of that highway from Bogalusa.

The driver of the truck had the right under the provisions of the statute, above reproduced, to drive to his left and to pass the sedan ahead, and Mr. Probst was therefore at fault in turning to his left, thus blocking the pathway of the truck, and cannot find relief under the doctrine of the last clear chance, as the truck driver was confronted by a sudden emergency created by the negligence of Mr. Probst, whose sudden turn was the proximate and unavoidable cause of the accident.

Hence, we are of the opinion that plaintiff's have no right to recover against defendant company, and that their demands should be rejected.

We shall enter a judgment in each case to that effect.

In this case, Franz H. Probst v. the defendant company, in which the evidence of all these cases was taken, it is ordered, adjudged, and decreed that the judgment appealed from be annulled and reversed; and that the demand of the plaintiff herein be rejected at his cost.